UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RODNEY E. BEERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:09CV827 TIA |
| ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income benefits under Title XVI of the Act. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On May 26, 2006, Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (Tr. 89-97) Plaintiff alleged disability beginning July 31, 2005 due to rheumatoid arthritis. (Tr. 56, 89, 109) Plaintiff's applications were denied on September 21, 2006, after which Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (Tr. 54-61) On June 19, 2008, Plaintiff appeared and testified at hearing before an ALJ. (Tr. 27-53) In a decision dated July 14, 2008, the ALJ determined that Plaintiff had been disabled since October 23, 2007, not July 31, 2005 as Plaintiff alleged. (Tr. 14-24) On August 24, 2009, the Appeals Council denied Plaintiff's Request for Review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. Upon examination by the ALJ, Plaintiff testified that he was 31 years old with a 10th grade education. Plaintiff did not complete the 11th grade. He worked as a corrections officer from 2000 to 2004 and as a self-employed construction worker in 2005. His duties included building decks, roofing, and performing concrete work. He had not worked since that job. Plaintiff also worked construction in 1998 and worked for Purcell Tire and Rubber in 1999 grinding old tread off tires. Plaintiff worked at the retread factory for one year. He stated that he lifted about 70 to 80 pounds, as he primarily lifted diesel truck tires. (Tr. 30-31)

Plaintiff further testified that he weighed 235 pounds and measured 6' 1". His weight increased since he stopped working. Plaintiff stated that he was no longer to perform work activities because it was "impossible." He denied having a conversation in December 2007 with Dr. Vintimilla regarding Plaintiff's ability to sit, lift, and perform other physical functions. Plaintiff testified that he woke up one day in 2005 feeling as though he broke both wrists. The pain then continued to move through his body. Plaintiff was then diagnosed with Rheumatoid Arthritis ("RA"). He stated that his ability to lift varied daily but that he could lift up to 10 pounds. On bad days he could not even lift a can of soda. Other days his wrists became so swollen that he was unable to tie his shoes or button his pants. Plaintiff testified that sometimes he could lift a can of soda, and sometimes he could lift a gallon of milk. While x-rays of Plaintiff's neck revealed evidence of arthritis, Plaintiff had not seen the results of x-rays of other parts of his body. (Tr. 32-34)

Plaintiff's attorney also questioned Plaintiff about his RA. Plaintiff stated that RA mostly affected his feet, hands, knees, hips, and shoulders. With regard to his feet, Plaintiff testified that

2

some mornings he would wake up to excruciating pain in his feet. They felt as though his feet and ankles were broken, and they were red and swollen, with a burning sensation. The pain frequently lasted all day and required him to wear house shoes because he could not tie his tennis shoes due to swelling. Usually, the pain improved later in the day, until 1:00 or 2:00 p.m. Plaintiff further testified that the problems with his feet affected his ability to stand and walk throughout the day. On a good day, Plaintiff could be on his feet ½ hour to 1 hour before needing to sit down. On a bad day, Plaintiff was unable to be on his feet at all. His wife would help him to the couch and turn on the TV, where he spent the entire day. With regard to sitting, Plaintiff testified that he needed to switch positions because staying in one spot bothered him. He would also need to get up, stretch, and try to walk around. However, if he stayed up too long, his RA would bother him. (Tr. 34-36)

Plaintiff further testified that he experienced problems with his hands. On bad days, Plaintiff found it difficult to perform any detailed work such as bending his fingers and knuckles, tying his shoes, or driving with the steering wheel, which bothered his wrists. With regard to his hips, Plaintiff stated that when the RA affected his hips, he experienced difficulty walking and sitting. Plaintiff also testified that different joints were worse or better on different days. For instance, the pain could be in his fingers and knees on one day then in his shoulders the next. Plaintiff could not make any plans because he did not know how he would feel from day to day. He did not notice a pattern but did find that his joints hurt the next day from overuse. (Tr. 36-37)

Plaintiff previously quit smoking, but his arthritic symptoms did not improve. However, he felt better overall. At the time of the hearing, Plaintiff had been seeing Dr. Vintimilla, a rheumatologist. He had tried several medications. HUMIRA helped at first but then his body became used to it. Plaintiff was undergoing infusion treatment, which entailed running medication through

3

Plaintiff's body for 5 to 7 hours via an IV. Plaintiff testified that he was scheduled to receive the treatment twice and that the treatment was to last for 6 months. He had recently started the infusion and did not yet know the effects. With regard to the HUMIRA, Plaintiff testified that he experienced side effects, which included upset stomach and fatigue. He gave himself HUMIRA injections once a week, and the side effects lasted two to three days after. Plaintiff stated that the medication did not change his ability to move around very much but did take the edge off the pain. (Tr. 37-40)

Plaintiff was taking methotrexate at the time of the hearing. That medication caused nausea and headaches, as well as elevated liver enzymes. Plaintiff underwent liver function testing at every doctor's appointment, usually every 1 or 2 months. He also took predinsone, which caused nausea. In addition, Plaintiff had to take medication for his bones, as the prednisone caused his bones to become brittle. (Tr. 40-41)

Plaintiff stated that he experienced a lot of pain and discomfort, which varied with different joints at different times. On a good day with medication, Plaintiff rated his pain as a 3 or 4 on a scale of 1 to 10. However, on a bad day his pain was a 9 or 10, and he just wanted to be left alone. Plaintiff lived in a mobile home with his wife, seven-year-old daughter, and four-year-old son. His pain made it harder to interact with his family or make plans with them. In addition, when Plaintiff was in pain, he had difficulty concentrating on anything. His wife worked outside the home. Plaintiff tried to help with some of the household chores such as straightening up the kids' rooms. He was unable to vacuum, sweep, or mop. On good days, he was able to do the dishes. Plaintiff could not describe a typical week. He testified that every week was different. One week he could have 3 or 4 good days, but during another week he could have no good days. He opined that he averaged 1 or 2 good days a week. He tried to prepare meals, and on a good day was able to fix something

4

quick. He did not go grocery shopping or do yard work. His brother helped with those chores. He had a driver's license but did not drive very much. On a good day, Plaintiff would drive a block to the store, but typically his wife did the driving. (Tr. 41-46)

Plaintiff also testified that he had difficulty sleeping. He woke up numerous times during the night and felt tired during the day. Fatigue was also a symptom of RA. Plaintiff believed he could lift a 2-liter bottle of soda on average. During the day, he needed to lie down or sleep at least once and sometimes two or three times. (Tr. 46-47)

The ALJ then asked Plaintiff some additional questions regarding past employment. Plaintiff testified that he quit his job as a corrections officer to take a higher paying job in environmental restoration. He worked there from July 2004 to July 2005. Once his RA started to bother him, he began missing work and was eventually fired. (Tr. 47-48)

A Vocational Expert ("VE") also testified at the hearing. The ALJ asked the VE to assume a hypothetical claimant of age 28 on the onset date with 10 years of education and the same past work experience as the Plaintiff. The ALJ also added that the person could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours in an 8-hour work day; sit for 6 hours; climb stairs and ramps occasionally; never climb ropes, ladders, or scaffolds; and avoid concentrated exposure to extreme cold and hazards of unprotected heights and vibrations. Given these restrictions, the VE testified that Plaintiff could not return to any of his past relevant work. However, the hypothetical individual could perform light work which included gate guard and cashier. (Tr. 49-50)

The ALJ then asked the VE to add a sit/stand option to the first hypothetical. The VE answered that the hypothetical individual could perform work as a gate guard and cashier, although

5

the number of jobs in the State of Missouri and nationally decreased significantly. If the ALJ took away the sit/stand option but added lifting only 10 pounds occasionally and less than 10 pounds frequently; stand and walk 2 hours in an 8-hour day; and sit for 6 hours, the VE testified that the individual could work as a security surveillance system monitor and bench assembly worker. (Tr. 50-51)

For the final hypothetical, the VE looked at a Physician Statement completed by Maria Vintimilla, M.D., Plaintiff's Rheumatologist. Dr. Vintimilla opined that Plaintiff could sit 2 hours; could stand/walk less than 2 hours; needed to shift positions at will; could not lift repetitively; could lift less than 10 pounds frequently and occasionally; and was limited in upper and lower extremities with regard to pushing and pulling. (Tr. 261-62) In light of these restrictions, the VE testified that the hypothetical individual was unable to work on a full-time basis. (Tr. 51)

Plaintiff's attorney also questioned the VE and added the limitations of fatigue and side effects from the medication that caused the need to take unscheduled naps or rest periods for ½ hour to 1 hour throughout the day. The VE answered that these limitations precluded all work. (Tr. 51-52)

In a Function Report – Adult, Plaintiff reported that, from the time he woke up until he went to bed, he took his medication, which made him sick to his stomach; tried to help his wife keep the house clean; and watched TV before bed. He went to bed early because he was up quite a bit at night dealing with constant pain. He fed and watered 2 dogs, but his wife usually cared for the pets. He could take care of most of his personal needs. Plaintiff sometimes prepared TV dinners. Although he could mow the lawn, it sometimes took 3 or 4 days to finish using a riding mower. He went outside almost every day and was able to drive. He could shop for food and basic necessities, but his

6

wife did most of the shopping on a bi-weekly basis. Plaintiff enjoyed reading, gardening, and hunting. However, he seldom hunted any more due to his inability to move around. Plaintiff spent time with his family daily and with his church and friends when able. He opined that his RA affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair climb, complete tasks, and use hands. He further reported that some days he was able to do 80% of what he used to do, but most days he was in too much pain. In addition, he indicated that he experienced difficulty paying attention. (Tr. 125-32)

### III.  Medical Evidence

On April 18, 2005, Plaintiff saw Dr. J. Paul Tindall for complaints of intense pain in his joints over the past 2 weeks. Plaintiff reported that the pain was in a different joint each day. Dr. Tindall ordered blood work. Plaintiff returned to Dr. Tindall for the results on April 22, 2005. Plaintiff reported pain and swelling in his wrists and stated that the swelling was in his ankles last week and hips before that. The pain improved during the day but worsened at night. Dr. Tindall discussed Plaintiff's Rheumatoid factor of 43 and treatment choices. In addition, Dr. Tindall planned to refer Plaintiff to a rheumatologist to begin disease modifying agents. On July 20, 2005, Dr. Tindall saw Plaintiff for a follow up and for a referral to a rheumatologist. (Tr. 154-56)

On June 21, 2005, Plaintiff was seen at the Washington University School of Medicine, Division of Rheumatology by Julie Unk, R.N., ANP-C. Plaintiff reported waking up in April 2005 with pain and swelling in his right wrists. Since that time, he had daily pains in various areas including his neck, shoulders, wrists, MCPs, right groin, hip knees, ankles, MTPs and toes. He also had intermittent swelling in these areas, along with morning stiffness for 2 hours or more. Plaintiff reported fatigue and severe pain. He had not worked since April due to pain. Laboratory data

7

showed a positive rheumatoid factor. Physical examination revealed tenderness and swelling of the right wrist, right PIPs, right first MTP, and left second and third MTPs. In addition, he had tenderness in his right shoulder, right hip, right MCPs, and right DIPs without swelling. Nurse Unk assessed rheumatoid arthritis and started him on methotrexate and prednisone. Plaintiff was to return in 1 month. Treatment notes indicated that Dr. Richard Brasington interviewed and examined Plaintiff and that Dr. Brasington agreed with the findings and plan. (Tr. 163-65)

Plaintiff returned to the Division of Rheumatology on March 9, 2006. Plaintiff continued to report morning stiffness lasting less than 1 to 2 hours involving his hips, ankles, and hands. He experienced moderate pain with and without activity in his neck, shoulders, elbows, wrists, MCPs, PIP, hips, knees, ankles, and feet, along with swelling in his hands. He had been taking methotrexate, folic acid, Naprosyn, and prednisone and reported feeling improved with some resistence in symptoms. He also reported some nausea. Plaintiff ran out of methotrexate 2 months before the appointment and had not refilled the prescription. He had not been seen since the prior summer because he had lost his insurance. Physical examination revealed tenderness to shoulders, elbows, and wrists, along with swelling in the MCPs and PIPs. Nurse Unk assessed rheumatoid arthritis and hypertension. Plaintiff was to resume methotrexate 15 mg per week then eventually increase to 20 mg per week if he tolerated the medication well without significant nausea. Dr. Leslie E. Kahl supervised the appointment. (Tr. 161)

On August 2, 2006, Plaintiff returned to Dr. Tindall. He complained of continued RA pain and depression related to his condition. Dr. Tindall prescribed Lexapro for Plaintiff's depression. (Tr. 180-81)

Dr. Barry Burchett examined Plaintiff on August 31, 2006 at the request of Disability

Determinations. The examination revealed trace redness of the metacarpal phalangeal joints of the #2, #3, #4, and #5 digits of the right hand and a hint of ulnar deviation bilaterally. He had normal range of motion of the joints of the fingers of both hands. Examination of the lower extremities revealed no tenderness, redness, warmth, swelling, fluid, laxity, or crepitus of the knees, ankles, or feet. His hips bilaterally demonstrated generalized tenderness, and the Patrick's test was positive bilaterally. He could heel-toe walk but could only squat 3/4 of expected due to bilateral hip and knee pain. Dr. Burchett also noted mild limitation of motion of the right shoulder. (Tr. 183-86)

Nurse Unk evaluated Plaintiff on September 22, 2006 for his rheumatoid arthritis. He had not been seen for over 6 months. Plaintiff reported morning stiffness in his hands and feet lasting 2 hours, along with mild to moderate pain, worse with activity, in his hands through MCPs, PIPs, knees, feet, and MTPs. He also had intermittent swelling in his hands, knees, and MTPs. The joint exam revealed tenderness and swelling. Nurse Unk ordered blood tests and added to his RA medication. (Tr. 219)

Plaintiff returned to Nurse Unk on October 30, 2006. He reported morning stiffness lasting 3 to 4 hours and moderate to severe pain involving the shoulders, elbows, wrists, MCPs, PIPs, hips, knees, ankles, MTPs and toes with swelling. The combination of medications did not improve his symptoms. Nurse Unk noted tenderness and swelling and diagnosed severe RA. She added prednisone and Enbrel to Plaintiff's medication regimen and advised him to return in 2 months. Dr. Brasington supervised the appointment. (Tr. 217)

On January 31, 2007, Plaintiff reported some improvement with Enbrel. Nurse Unk discontinued some of the RA medication and continued with the Enbrel and methotrexate combination. (Tr. 215) When Plaintiff returned to Nurse Unk on June 20, 2007, he reported morning

9

stiffness lasting half the day, primarily in his feet and ankles, but also in his shoulders, upper neck, hips, and hands. The pain worsened after he discontinued using hydroxychloroquine and sulfalazine. The prednisone helped his symptoms, but he experienced oral sores as well. Nurse Unk re-started prednisone and referred Plaintiff to Dr. Maria Vintimilla, who was closer to Plaintiff's home. (Tr. 213)

Plaintiff saw Dr. Vintimilla, a rheumatologist, on August 6, 2007. Plaintiff noted that his symptoms worsened after decreasing prednisone. He complained of pain in his right knee, ankles, shoulders, and hips, as well as bilateral metacarpophalangeal joint and proximal interphalangeal joint areas. The medications helped with the hand symptoms more than the large joint symptoms. In addition, he reported morning stiffness lasting about 4 hours. The musculoskeletal exam revealed mild warmness and some tenderness but no swelling. Dr. Vintimilla continued the prednisone and prescribed calcium, methotrexate, folic acid, and ibuprofen. (Tr. 258-59) Plaintiff returned to Dr. Vintimilla on October 23, 2007 and continued to complain of joint swelling, morning stiffness, and arthralgias, which were not relieved from nsaids. Plaintiff stated that his symptoms only mildly improved. Upon examination, Dr. Vintimilla noted significant swelling, tenderness, and warmness. (Tr. 256-57)

Dr. Vintimilla submitted a Physician's Statement on December 14, 2007. She diagnosed Rheumatoid Arthritis/Osteopenia. Because RA was a progressive disease, Plaintiff's prognosis was guarded. His symptoms included joint pain and swelling in the hands, shoulders, knees, and ankles, along with a significant inability to perform activities of daily living. During an 8-hour workday, Plaintiff could stand/walk less than 2 hours and sit about 2 hours. He needed to shift positions at will and periodically alternate between sitting and standing to relieve pain. Plaintiff could perform no

10

repetitive lifting due to swelling in the joints which would worsen and progress to deformities. Dr. Vinitimilla further opined that Plaintiff could frequently and occasionally lift less than 10 pounds. He was limited in his ability to push or pull in both the upper and lower extremities. Additional symptoms included arthralgias, joint swelling/pain, chronic fatigue, muscle weakness, stiffness, and depression. Further, Plaintiff's illness caused lowered resistence and exacerbated response to disease. Dr. Vintimilla stated that Plaintiff's symptoms were constant throughout the day and night, which would included an entire 8-hour workday. (Tr. 261-62)

### IV. The ALJ's Determination

In a decision dated July 14, 2008, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010. He had not engaged in substantial gainful employment since July 31, 2005, his alleged onset date. Plaintiff's severe impairments included rheumatoid arthritis and degenerative disc disease of the cervical spine. The ALJ found that Plaintiff's impairments of hypertension, side effects from medication, and depression did not impose any significant work-related limitations and were not severe. Further, since the alleged onset date, Plaintiff did not have an impairment or combination of impairments that met or medially equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16)

The ALJ further determined that, prior to October 23, 2007, the date Plaintiff became disabled, he had the residual functional capacity (RFC) to occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; occasionally climb ramps and stairs; never climb ropes, ladders, and scaffolds; alternate between sitting and standing; and avoid concentrated exposure to extreme cold, hazards of heights, and hazards of machinery. The ALJ noted that the evidence did not establish

that Plaintiff was unable to use his arms and hands to grasp, hold, and turn objects before October 23, 2007. The ALJ assessed the medical evidence and found that the opinions of Nurse Unk were not considered acceptable medical sources, as she was a nurse practitioner. However, the records did provide reliable information helpful in determining Plaintiff's RFC in that Nurse Unk's notes did not support a more limited RFC prior to October 23, 2007. The ALJ noted gaps in treatment and found that, although Plaintiff reported limited activities, the weak medical evidence demonstrated inconsistencies in Plaintiff's allegations that he needed to lie down during the day. (Tr. 15-20)

The ALJ next determined that, beginning October 23, 2007, Plaintiff had the RFC to occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; occasionally climb ramps and stairs; never climb ropes, ladders, and scaffolds; alternate between sitting and standing; and avoid concentrated exposure to extreme cold, hazards of heights, and hazards of machinery. In addition, Plaintiff could not use his arms and hands repetitively to grasp, hold objects, turn objects, or use his hands and fingers for repetitive hand-finger activities. Plaintiff did not have the capacity to sustain sedentary work activity on a regular and continuing basis. The ALJ noted Dr. Vintimilla's treatment notes demonstrating significant swelling, warmness, and tenderness, which supported Plaintiff's allegations of disabling symptoms and limitations. (Tr. 20-21)

The ALJ noted that since the alleged onset date, Plaintiff was unable to perform his past relevant work. The ALJ relied on VE testimony to find that, prior to October 23, 2007, there were a significant number of jobs in the national economy that Plaintiff could have performed. However, Plaintiff became disabled on October 23, 2007 and continued to be disabled through the date of the decision. Thus, the ALJ concluded that Plaintiff had been disabled since October 23, 2007 and recommended that Plaintiff undergo a continuing disability review in 2 years. (Tr. 21-24)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that claimant is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record *de novo*. Id. at 1328 (citing Robert v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence,

the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount a plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

14

support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak, 49 F.3d at 1354.

## VI. Discussion

Plaintiff raises two arguments in his brief in support of the complaint. Plaintiff contends that the ALJ erred in finding that Plaintiff's disability onset date was October 23, 2007 instead of an earlier date. In addition, Plaintiff argues that the ALJ failed to consider the effect of all of Plaintiff's impairments when determining his RFC prior to October 23, 2007. Defendant, on the other hand, asserts that substantial evidence supports the ALJ's onset date determination. Further, Defendant maintains that the ALJ properly evaluated Plaintiff's RFC and determined that Plaintiff could perform work existing in significant numbers in the national economy prior to October 23, 2007. The undersigned finds that substantial evidence does not support he ALJ's determination and that this cause should be remanded for further review.

Plaintiff claims that the ALJ failed to properly apply the provisions of SSR 83-20 to the analysis of Plaintiff's onset date and that the onset date of October 23, 2007 is not supported by substantial evidence. The undersigned agrees. "Social Security Ruling 83-20 governs the determination of disability onset dates and is binding on the Commissioner, including decisions of an ALJ." Legrand v. Astrue, No. 4:08CV326 FRB, 2009 WL 801599, at *23 (E.D. Mo. March 25, 2009); see also 20 C.F.R. § 402.35(b)(1) (2007) (stating that Social Security Rulings "are binding on all components of the Social Security Administration). Social Security Ruling 83-20 provides, in pertinent part:

> In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability. In many claims, the onset date is critical; it may affect the period for which the individual may be paid and may even be determinative

of whether the individual is entitled to or eligible for any benefits. . . . Consequently, it is essential that the onset date be correctly established and supported by the evidence, as explained in the policy statement.

. . .

The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence. These factors are often evaluated together to arrive at the onset date. However, the individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence.

. . .

With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

. . .

In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

. . .

The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

SSR 83-20, 1983 WL 31249, at *1-3 (Soc. Sec. Admin. 1983).

This regulation requires the ALJ to call a medical advisor where the evidence of onset is ambiguous. See Legrand, 2009 WL 801599, at *24 (stating that the assistance of a medical advisor is required where medical evidence of onset is ambiguous); Westbrook v. Astrue, No. 4:06CV997 DDN, 2007 WL 5110314, at *9 (E.D. Mo. Aug. 29, 2007) ("In cases where the onset date must be inferred, the ALJ should call on the services of a medical advisor.").

Here, Plaintiff asserts that the October 23, 2007 onset date selected by the ALJ does not contain convincing rationale. The undersigned agrees and also finds that the onset date is ambiguous such that the ALJ should utilize a medical advisor to determine the actual onset date of disability. Plaintiff was diagnosed with RA[2] in April 2005 and went to the Washington University School of Medicine, Division of Rheumatology as early as June 2005. (Tr. 154-56, 163-65) At that time, physical examination revealed tenderness and swelling of the hands, and tenderness in the right shoulder and hip, as well as his feet. (Tr. 164) Throughout his treatment, Plaintiff continued to complain of morning stiffness lasting as little as 1 hour, but as much as half the day, despite taking several medications. (Tr. 161, 163, 213, 217, 219) During the consultative examination in August of 2006, Dr. Burchett found trace redness in the hands and a hint of ulnar deviation bilaterally, as well as generalized tenderness in the hips bilaterally and a positive Patrick's test.[3] (Tr. 184-86) Despite

---

[2] Rheumatoid arthritis is "a generalized disease . . . which primarily affects connective tissue; a[rthritis] is the dominant clinical manifestation, involving many joints, especially those of the hands and feet . . . ; the course is variable but often is chronic and progressive, leading to deformities and disability." Stedman's Medical Dictionary 160 (28th ed. 2006).

[3] A Patrick's test is used "to determine the presence or absence of sacroiliac disease." Stedman's Medical Dictionary 1957-58.

this evidence, the ALJ chose October 23, 2007, the second appointment Plaintiff had with his new rheumatologist, Dr. Vintimilla, as the onset date. However, Plaintiff lodged the same complaints of joint swelling and morning stiffness during this visit as he had during previous appointments. (Tr. 256) In addition, while the ALJ relied on Dr. Vintimilla's findings of significant swelling and warmness in several joints, the Plaintiff correctly points out that previous examinations had also revealed swelling. (Tr. 164, 213, 215 217, 219)

Rheumatoid arthritis is a progressive disease. At this time, it is difficult to determine the exact time when the condition became disabling. While the ALJ determined the date was in October of 2007, the record also contains information that the RA could have been disabling on the date of diagnosis or at the time of any of his visits with the rheumatologists at Washington University School of Medicine.[4] Thus, the undersigned finds the onset date ambiguous, requiring a medical adviser to determine said date on remand. See Long v. Astrue, No. 4:07CV2111 JCH, 2009 WL 705879, at *9 (E.D. Mo. March 16, 2009) (remanding the case for redetermination of onset date with assistance of medical advisor in compliance with SSR 83-20); Westbrook, 2007 WL 5110314, at *10 (finding the possibility of several onset dates ambiguous and remanding the case to the Commissioner with directions to utilize the assistance of a medical advisor to redetermine the onset date).

In addition, should the ALJ find that Plaintiff was able to work at any time after his alleged

---

[4] The undersigned notes that the treatments notes at the Washington University School of Medicine, Division of Rheumatology were produced by a nurse practitioner. Under SSR 06-03p, nurse practitioners are not "acceptable medical sources" but rather "other sources" to show the severity of an individuals's impairment. While these sources cannot establish the existence of a medically determinable impairment, they "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p, 2006 WL 2329939, at *2 (Soc. Sec. Admin. Aug. 9, 2006). However, each appointment was also supervised by a medical doctor in the Division of Rheumatology, which could possibly give more weight to these treatment notes and medical opinions.

18

onset date of July 31, 2005 but before redetermined onset date, the ALJ should better assess Plaintiff's RFC in his determination. Residual Functional Capacity (RFC) is a medical question, and the ALJ's assessment must be supported by substantial evidence. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citations omitted). RFC is defined as the most that a claimant can still do in a work setting despite that claimant's limitations. 20 C.F.R. § 416.945(a)(1). "Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis present).

The ALJ has the responsibility of determining a claimant's RFC "'based on all the relevant evidence, including medical records, observations of treating physicians and others, and [claimant's] own description of her limitations.'" Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "An 'RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).'" Sieveking v. Astrue, No. 4:07 CV 986 DDN, 2008 WL 4151674, at *9 (E.D. Mo. Sept. 2, 2008). Further, "[t]he ALJ's RFC determination must be supported by medical evidence that addresses the claimant's ability to function in the workplace." Tinervia v. Astrue, No. 4:08CV00462 FRB, 2009 WL 2884738, at *11 (E.D. Mo. Sept. 3, 2009) (citations omitted); see also Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (citations omitted) (finding that medical evidence "must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the

19

claimant's 'ability to function in the workplace,' . . . ."). In addition, it is well settled "that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel." Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). The ALJ may not rely upon his or her own inferences. Id. at 858.

Based on the foregoing, the undersigned finds that this case should be remanded for further proceedings. On remand, the ALJ shall redetermine the onset date of Plaintiff's disabling rheumatoid arthritis with the assistance of a medical advisor and shall provide specific findings and convincing rationale to support this determination in accordance with SSR 83-20.

Accordingly,

**IT IS HEREBY ORDERED** that this cause be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order. A separate Judgment in accordance with this Memorandum and Order is entered this same date.

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of March, 2011.